739 P.2d 814

Lynn B. JANIS; Morwest Developments Arizona, Inc., an Arizona corporation, Plaintiffs/Appellants/Cross-Appellees.

v.

Louis C. SPELTS, Jr. and Sally Jo Spelts, husband and wife, the 40th Street and Van Buren General Partnership, an Arizona corporation, Defendants/Appellees/Cross-Appellants.

No. 2 CA-CV 87-0030.

Court of Appeals of Arizona, Division 2, Department A.

March 12, 1987.

Reconsideration Denied April 21, 1987.

Review Denied June 30, 1987.

Kaplan, Jacobowitz, Byrnes, Rosier & Hendricks, P.A. by Richard G. Himelrick, Phoenix, for plaintiffs/appellants/cross-appellees.

Shull, Wortman & Watland, P.C. by Robert A. Shull and Adrianne Kalyna, Phoenix, for defendants/appellees/cross-appellants.

## OPINION

HOWARD, Presiding Judge.

This lawsuit involved two parcels of land, 320 acres in Carefree, Arizona, and certain property in Phoenix at 40th Street and Van Buren (40th Street Property). The plaintiffs filed a complaint seeking the imposition of a constructive trust on the Carefree property and a division of certain profits on the sale of the 40th Street Property. In conjunction with the filing of the complaint, plaintiffs filed a lis pendens on the Carefree property. The defendants answered and counterclaimed for removal of the lis pendens, together with damages, attorney's fees and costs pursuant to A.R.S. § 33–420(C). The case was tried to a jury.[1] Both parties won and lost in the lower court. The jury found that a constructive trust should not be imposed on the 320 acres, that the plaintiffs' position on the split of the profits from the sale of the 40th Street Property was correct and that plaintiff Lynn Janis recorded a wrongful lis pendens on the Carefree property. The jury further awarded the sum of $1 in damages for the filing of the wrongful lis pendens.

The trial court, incorporating the jury's findings, ordered that no constructive trust be placed on the 320 acres, split the money being held from the sale of the 40th Street Property according to the jury's verdict, invalidated the lis pendens, awarded the defendants $1,000 damages for the wrongful lis pendens pursuant to A.R.S. § 33–420, and refused to award costs and attorney's fees to either party.

The plaintiffs' appeal is directed toward the failure of the court to impose a constructive trust on the Carefree property. The defendants have cross-appealed, claiming that the trial court abused its discretion in failing to grant them attorney's fees and costs pursuant to A.R.S. §§ 12–341, 12–341.01 and 33–420.

1. The jury was advisory as to the claim for a constructive trust.

We consider the evidence on the constructive trust claim in the light most favorable to the prevailing party, the defendants, and give them the benefit of all reasonable inferences arising from that favorable view of the evidence. *McFarlin v. Hall,* 127 Ariz. 220, 619 P.2d 729 (1980). In March 1984, plaintiff Morwest Developments Arizona, Inc., entered into a contract to purchase 320 acres of land in Carefree. Morwest did not have the funds to close the escrow and needed a financial partner. According to Morwest's president, Lynn Janis, a typical mode of business for Morwest is to locate a property that can be purchased on favorable terms, place the property under contract and then bring in a financial partner who is given an interest in the property in return for providing the cash required to close the sale.

Janis told Jim Pigeon, a real estate broker, about his desire for a financial partner, and Pigeon introduced him to Louis Spelts. Pigeon later arranged a meeting between Janis and Spelts where they talked about acquiring the property. Specific details were not discussed at this first meeting. Later, Spelts and Janis had a discussion over the telephone. The deal discussed was that Janis, who had already placed $50,000 in escrow on the 320 acres, wanted Spelts to replace the $50,000 with Spelts' own funds and then Janis and Spelts would share equally the cost of closing the escrow.

Spelts knew at the outset that $80,000 had to be deposited in the escrow in August 1984 and $510,000 was needed to close the deal in September. Spelts understood from Janis that Janis would pay $40,000 of the $80,000 due in August, with Spelts paying the other $40,000. As for the $510,000, Janis agreed to be responsible for $255,000 and stated in May 1984 that although he did not have these funds at the time, he would have them at the close of escrow.

Sometime at the beginning of the summer of 1984, Spelts gave Janis $50,000. At that time, the parties discussed the preparation of a written joint venture agreement. Janis stated that he would take responsibility for preparing the document.

The first joint venture draft agreement was received by Spelts in June 1984. It was very crude and did not encompass capital account provisions, default provisions or bankruptcy provisions, among other things, and the document was totally unacceptable to Spelts. Additionally, the provision for contribution of funds was different than the deal Spelts and Janis had discussed. The draft provided that Spelts was to pay the entire August payment of $80,000. Although this was not Spelts' original understanding, he did end up timely paying the entire $80,000 to the escrow.

Spelts spoke directly to Janis and his representative, Tom Snyder, about the problems with the first draft. Spelts gave Snyder a copy of an agreement from another joint venture he was involved in known as the Cimarron Agreement, for use as a guide in drafting the capital accounts clause, the default provisions and the bankruptcy provisions. Spelts told Janis that the agreement had a great deal of development language that was not relevant. Snyder said he was going to take it to Janis' attorney, Barry Hart. This was in October 1984. Approximately one month later, Snyder brought a second draft of the joint venture agreement to Spelts, stating that neither he nor Janis had ever read the draft agreement. Within a day of its delivery, Spelts reviewed the draft agreement and discovered that it was nothing more than a carbon copy of the entire Cimarron Agreement Spelts had previously given to Snyder. The Cimarron deal, in its entirety, was a development project concerning construction of industrial and office buildings. The 320–acre deal involved only the purchase and resale of the property. The language in the agreement as prepared by Janis was totally inappropriate to the deal Janis had represented to Spelts prior to Spelts putting up any money. The only matters the agreement cleared up were the capital account treatment, the bankruptcy clause and the default clause. The rest of the agreement was totally wrong. Spelts told Snyder, Hart and Janis about the problems, and in early December Janis told Spelts he was working on the problem with Hart.

Until the end of November, Janis continued to represent to Spelts that he could close the deal and would have his half of the closing money. Then, Janis asked Spelts to try to get a loan from Spelts' bank to close the deal as Janis would not have the money. Spelts suggested that Janis go to the bank himself for his own half. This he did, but the bank turned Janis down. Spelts then went to the bank on his own and obtained a loan for $550,000 which he personally guaranteed. The $510,000 was to close escrow and the remainder reimbursed Spelts for $40,000 of the $80,000 he had deposited in escrow in August.

At the beginning of December, Spelts had placed $130,000 in escrow, was obtaining a loan for the money needed to close the deal and still had no acceptable joint venture agreement from Janis. Janis had broken every promise he had made to Spelts from their first meeting regarding the funding of the 320–acre deal. If the escrow did not close in December, Spelts would lose the $130,000 to the sellers. Janis could not put up any money even though he had previously represented to Spelts that he had the ability to do so.

At the close of escrow, approximately December 19, 1984, no joint venture agreement had been signed. On December 19, Spelts and Janis then entered into a new agreement. Janis agreed to nominate Spelts to take title to the property if Spelts signed a letter, dated September 19, 1984, allowing Janis the opportunity to get back in the original deal, by forming and funding a joint venture prior to January 31, 1985. Janis never offered to pay Spelts his half of the $130,000. Spelts knew that if he did not close the escrow on Janis' terms, he would lose the entire $130,000 with no contribution from Janis.

Spelts signed the December 19, 1984, letter prepared by Janis. The letter stated:

"This letter will confirm our discussions today that my wife and I ("Spelts") hereby agree to transfer and assign ("Transfer") on or before January 31, 1985, any and all interest in that certain real property ("Property") we acquired through Escrow No. 44–5340 to the Spelts/Janis Joint Venture ("Joint Venture").

Transfer is conditioned upon Lynn B. Janis ("Janis") paying the sum of One Hundred Thirty Thousand ($130,000.00) Dollars to the Joint Venture on or before January 31, 1985.

Contemporaneously with the payment by Janis to the Joint Venture of the sum of $130,000.00, Spelts agree to transfer all of their interest in the Property to the Joint Venture.

Following the above payment by Janis to the Joint Venture, Spelts will, at their sole and exclusive discretion, have the right to either receive the sum of $130,-000.00 personally from the Joint Venture, or use the sum of $130,000.00 to reduce any indebtedness of Spelts in connection with the initial funding of the Property.

We have also agreed that following the receipt by the Joint Venture of the sum of $130,000.00, and as consideration therefore, the respective interests of Janis and Spelts in the Joint Venture shall each be fifty (50%) percent.

We have further agreed that following the completion of all of the above, the Capital Account in the Joint Venture of Janis will be $130,000.00 and the Capital Account of Spelts in the Joint Venture will be zero."

Spelts fully intended to convey the property to the joint venture if an acceptable agreement was executed prior to January 31, 1985, and Janis came up with $130,000.

Shortly after the escrow closed in Spelts' name, Spelts spoke with Snyder who told him that Janis was going to complete and correct the final joint venture agreement. On January 28, 1985, Spelts received by mail another written joint venture agreement. The cover letter stated, inter alia, that the $130,000 had been deposited as required by the December 19 letter agreement. Snyder told Spelts that Janis had not read the agreement and had not signed it even though the cover letter stated that copies were executed. The January 1985 joint venture agreement was not any different from the December 1984 agreement

which Spelts had already rejected. No mention was made in the agreement of the $510,000 borrowed personally by Spelts for the balance of the closing costs.

Janis himself did not consider the January 1985 agreement final. He did not involve himself in the preparation of the document and apparently felt that he could modify it to his liking after the January 31, 1985 cut-off date. Janis testified that he did not feel the January 1985 document embodied the agreement of the parties. He knew the $510,000 bank loan should have been mentioned in the January agreement but was not. Janis admitted that Spelts had lived up to his end of the deal and that Janis had not. Spelts concluded that Janis was not proceeding in good faith, resolved to have nothing further to do with him and refused to recognize any interest by Janis or Morwest in the property.

■ The jury concluded that Spelts had acted in good faith and that a constructive trust should not be imposed. The jury answered interrogatories in which it found that while both Janis and Spelts had complied with the December 19 letter, Janis had engaged in willful misconduct in regard to the December 19 letter.[2]

The plaintiffs contend that they should have prevailed in the court below because Spelts breached his fiduciary responsibilities when he retained the title to the property without his co-venturer's consent. This issue might have some merit if the parties had become joint venturers. However, the evidence shows the joint venture never actually came into existence. The jury and the judge both found that Spelts acted in good faith. There is evidence to support this conclusion. We are not the triers of fact and do not weigh the evidence.

In their cross-appeal the defendants contend that the trial court erred in not awarding them costs and attorney's fees. They argue that the jury's verdict for them on their counterclaim mandates recovery of costs and attorney's fees under A.R.S. § 33–420(C), which provides:

"(C) A person named in a document which purports to create an interest in, or a lien or encumbrance against, real property who knows that the document is forged, groundless, contains a material misstatement or false claim or is otherwise invalid shall be liable to the owner or title holder for the sum of not less than one thousand dollars, or for treble actual damages, whichever is greater, and reasonable attorney fees and costs as provided in this section, if he wilfully refuses to release or correct such document of record within twenty days from the date of written request from the owner or beneficial title holder of the real property."

They also claim they were entitled to costs, as the successful parties, under A.R.S. § 12–341 and should also be awarded attorney's fees under A.R.S. § 12–341.01.

■ We agree with defendants that the award of attorney's fees and costs under A.R.S. § 33–420(C) is mandatory. As for their entitlement to costs under A.R.S. § 12–341, the awarding of costs to the "successful party" is also mandatory. *Trollope v. Koerner*, 21 Ariz.App. 43, 515 P.2d 340 (1973). It is clear that the defendants were the "successful party" on that count of the complaint dealing with the Carefree property and the counterclaim asking for damages in removal of the lis pendens. Therefore, the awarding of costs was mandatory.[3]

Apparently, the plaintiffs were the successful party on the count of the complaint dealing with the distribution of the $200,000 in escrow for the sale of the 40th Street Property. This claim arose out of a different fact situation, was in reality a separate action, and should be treated as such for purposes of awarding costs under A.R.S. § 12–341. Cf. *Ocean West Contractors, Inc v. Halec Const. Co., Inc.*, 123

---

2. The jury apparently agreed with Spelts' argument that he only signed the agreement because Janis was holding a gun to his head by refusing to transfer title unless he agreed to the new deal.

3. Of course, the defendants cannot recover their costs twice, once under A.R.S. § 33–420 and also under A.R.S. § 12–341.

**598**

Ariz. 470, 600 P.2d 1102 (1979). However, the plaintiffs have not appealed the failure to award them their costs under this count.

■ As for the awarding of attorney's fees under A.R.S. § 12-341.01 to the defendants, the successful party on the Carefree claim, the case of *Associated Indem. Corp. v. Warner,* 143 Ariz. 567, 694 P.2d 1181 (1985), makes it clear that the trial judge has broad discretion in deciding whether to grant attorney's fees under that statute. One of the considerations that should be taken into account in deciding whether or not to grant attorney's fees is the merit of the claim or defense presented by the unsuccessful party. *Associated Indem. Corp. v. Warner,* supra. While we have recited the facts in this case in the light most favorable to the prevailing party, the record demonstrates that the evidence was conflicting, especially as to the motives of the various parties concerned. We are unable to say the trial court abused its discretion in failing to award the defendants their attorney's fees under A.R.S. § 12-341.01. However, A.R.S. § 33-420 mandates the awarding of attorney's fees. The plaintiffs contend that the judge was entirely correct in refusing to grant attorney's fees under this latter statute because the defendants were not able to state, with exactness, what time was spent on the claim involving the 40th Street Property. The record does not support this contention.

The defendants have requested and are entitled to reasonable attorney's fees on appeal which will be awarded upon compliance with Rule 21(c), Rules of Civil Appellate Procedure, 17A A.R.S.

The issues of costs under A.R.S. § 12-341 and attorney's fees under A.R.S. § 33-420 are remanded to the trial court for further proceedings consistent with this opinion. The judgment is affirmed in all other respects.

HATHAWAY, C.J., and
FERNANDEZ, J., concur.